Estate of Bertha V. Nottingham, Deceased, Mark C. Nottingham, Administrator v. Commissioner. M. C. Nottingham v. Commissioner.
Estate of Nottingham v. Commissioner
Docket Nos. 42874, 42875.
United States Tax Court
T.C. Memo 1956-281; 1956 Tax Ct. Memo LEXIS 11; 15 T.C.M. (CCH) 1454; T.C.M. (RIA) 56281; December 28, 1956
*11 George M. Bryant, Esq., 1117 Rowan Building, 458 South Spring Street, Los Angeles, Calif., for the petitioners. Mark Townsend, Esq., and J. Earl Gardner, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax for 1942, income and victory taxes for 1943, and additions to tax for fraud, as follows: M. C. Nottingham
Addition
Year
Tax
Deficiency
to Tax
1942
Income
$2,887.99
$2,125.18
1943
Income and Victory
6,102.46
3,051.23
Bertha V. Nottingham
1942
Income
$2,887.99
$2,125.18
1943
Income and Victory
6,083.66
3,041.83
By amended answers, the respondent claimed additional deficiencies in income tax and additions to tax for fraud, as follows: M. C. Nottingham
Addition
Year
Tax
Deficiency
to Tax
1942
Income
$3,183.34
$1,591.67
1943
Income and Victory
151.70
75.85
Bertha V. Nottingham
1942
Income
$3,183.34
$1,591.67
1943
Income and Victory
157.20
78.60
The questions presented are: 1. Did the respondent correctly determine that petitioners overstated cost of goods sold in 1942 by the amount *12 of $6,334? 2. Did the respondent correctly determine allowable deductions for business expenses in 1942 and 1943? 3. Did the respondent correctly disallow claimed salary deductions of $4,000 and $12,000 in 1942 and 1943, respectively, for purported payments made to E. Fred Gearheart? 4. Did the respondent correctly disallow $8,171.14 claimed as expense of labor and wages in 1942, of which amount $2,695.22 represented payroll checks paid to petitioner Mark Nottingham, and $5,475.92 represented amounts deducted but never paid under a profit-sharing agreement between petitioners and four employees? 5. Are petitioners entitled to additional deductions in computing their community distributable share of 1942 and 1943 income from the M. C. Nottingham Construction Co., a partnership? 6. Did the respondent correctly determine that the petitioners filed false and fraudulent returns for 1942 and 1943? At the trial many items were conceded by the parties and effect will be given to these concessions upon settlement under Rule 50. Findings of Fact Facts stipulated by the parties are incorporated herein by reference. Petitioners are Mark C. Nottingham (hereinafter sometimes referred *13 to as "petitioner") and Mark C. Nottingham as administrator of the estate of Bertha V. Nottingham, his deceased wife. During the years 1942 and 1943 petitioner and Bertha V. Nottingham were husband and wife, residing in Los Angeles County, California. They filed, on a community property basis, separate original and amended returns for 1942 and separate returns for 1943 with the collector of internal revenue for the sixth district of California. During the years involved herein, petitioners were engaged in the business of sewage disposal and the manufacture and installation of septic tanks as a sole proprietorship d/b/a the M. C. Nottingham Co. (hereinafter referred to as "the proprietorship"). The petitioner was also a co-partner in the M. C. Nottingham Construction Co. (hereinafter referred to as "the partnership"), which was engaged in the installation of sewers, storm drains and similar underground construction work. Petitioner during 1943 was also a partner in the Arroyo Seco Oil Company. Petitioners kept their books and filed their returns on an accrual basis. The offices of the proprietorship and the partnership were located in the residence of petitioners. The adjustments *14 by respondent to 1942 income of the petitioners are based on the original returns filed by petitioners. In computing the deficiencies for such year, however, petitioners have been credited with the additional amounts paid by them on their amended returns. During 1942 and 1943 petitioners maintained many different bank accounts. Also separate sets of books were maintained for different jobs and for different branches of the proprietorship. Overstated Cost of Merchandise Hygiene Products Company (hereinafter referred to as "the corporation") was a corporation wholly owned by the petitioners. It had been dormant for two years prior to 1942 and remained so for two years thereafter. No separate office was maintained by the corporation and it had no employees. No books, records or bank accounts were maintained by the corporation. On May 15, 1942, petitioner acting for the proprietorship entered into a contract with the United States to furnish and install septic tanks at alien induction centers located at Pinedale, California. The contract was at cost plus a percentage of 15 or 20 per cent. The septic tanks supplied for the Pinedale job were manufactured by the proprietorship *15 in Temple City and were shipped from there. The cost of manufacturing the tanks was $5,786. The petitioner caused entries to be made on the proprietorship books reflecting a sale of these tanks to the corporation at $5,786 and later entries reflecting the purchase of these same tanks from the corporation by the proprietorship for $12,120. These entries were made by the bookkeeper pursuant to instructions which she received from the petitioner. On the first transaction a check for $5,786 was drawn on one bank account of the proprietorship and deposited in another bank account of the proprietorship. On the second transaction a check for $12,120 was drawn on the Fresno bank account of the proprietorship and was deposited in one of the Temple City bank accounts of the proprietorship. Income and excess profits tax returns for 1942 were filed by the corporation reporting sales of $12,120 and cost of merchandise of $5,786. No freight expense or other deductions were claimed on such returns. An application for an extension of time for filing the corporate income tax return was made and granted on the grounds that petitioner was away and his supervision was needed to prepare the return *16 since he had supervised all the records and business affairs of the corporation. The amounts reported and paid as income and excess profits tax by the corporation for the year 1942, plus interest, have been refunded to it by the Treasurer of the United States. The amount of the refund was $2,268.02. The respondent determined that cost of goods sold by the proprietorship had been overstated by the amount of $6,334, and added this amount to the income reported by petitioners. Expense Deductions Personal expenses of the petitioners were entered on the proprietorship books, and deductions were claimed for such expenses as business expenses in returns filed by petitioners for the years 1942 and 1943. In 1942 petitioner purchased a cocktail bar, bar stools, a sofa and other furniture for $329.60. Two payments were made on the purchase, one for $200 and the other for $129.60. The first payment was charged on the books to "Repairs to Equipment" and the second payment was charged to "Office Expense". The furniture was used to furnish a rumpus room in the basement of petitioners' combination home and office. The room was used for the entertainment of customers and employees. The *17 furniture purchased for this room was still in use after the years involved herein. In 1942, petitioners purchased a case of whiskey for $56.80, and paid $27.67 for a bicycle to replace one destroyed by their truck. Disallowance of Gearheart Payments E. Fred Geraheart was placed on the proprietorship payroll in September 1942 and received $1,000 a month for the remaining four months in 1942 and for twelve months in 1943, a total of $16,000. These amounts were deducted by petitioners as "Salary - Sales and Promotion" in 1942 and as "Labor" in 1943. Gearheart's principal business in 1942 and 1943 was the operation of a jewelry store as a sole proprietor, which business he had started in 1938. His net profits from the jewelry business in 1942 and 1943 were between $2,000 and $3,000, which were average profits for him at that time. Gearheart was the highest priced man on the proprietorship payroll except some of the branch managers. He came to the proprietorship office on very few occasions and none of the regular employees knew of any work performed by him. He was a close personal friend of petitioner. During 1942 Gearheart was listed as a "clerical" employee on workmen *18 compensation records maintained by petitioners and this designation was changed on such records to "salesman" in 1943. Though Gearheart's residence, jewelry store and regular bank accounts were located in Temple City, he opened a new checking account and a savings account in Compton in the Security-First National Bank (hereinafter referred to as the "Compton bank") where he deposited most of the amounts received from petitioners. Compton is located about 20 miles from Temple City. On the signature cards, Gearheart listed as his residence address the address of his sister-in-law in Compton rather than his own residence in Temple City. Gearheart opened the new and separate account for the amounts received by him from petitioners "so it wouldn't get messed up with my [his] own account." During 1942 and 1943 Gearheart was Secretary of the Chamber of Commerce in Temple City. During both years the petitioner was also a member of the same Chamber of Commerce and was President during one of the years. Gearheart's alleged "work" for petitioners consisted of reporting to petitioner rumors and reports about three jobs which he heard at Chamber of Commerce meetings. Gearheart went to *19 one meeting of the Chamber of Commerce in 1942. He went to six or seven meetings in 1943 and petitioner was also present at some of these meetings. Gearheart did not contact anyone about jobs, did not go out and make any bids, and knew little about petitioner's business. The revenue agent, in investigating petitioners herein, called upon Gearheart and asked him to produce retained copies of his 1942 and 1943 income tax returns. Gearheart turned over to the agent a purported retained copy of his 1943 return. Such copy was not in fact a copy of the filed return but contained only Gearheart's individual income and deductions and tax liability thereon without including the $12,000 alleged payments received from petitioners in 1943. Upon being informed by the agent that the document was not a copy of the filed return, Gearheart then produced a retained copy of the filed 1943 return. The first copy handed the agent computed Gearheart's tax liability for 1943 without including the $12,000 received from petitioners in 1943 and also listed the tax liability for 1942 without including the $4,000 received from petitioners in 1942. [1]
*20 Gearheart drew certain checks on his Compton bank account which were deposited in his regular Temple City bank account. A check in the amount of $1,501.23 was drawn by Gearheart on his Compton account on March 14, 1943. About $1,100 or $1,200 of this amount was used by Gearheart to purchase two diamond rings which were allegedly sold by him to petitioners. A check in the amount of $246.27 was drawn by Gearheart on his Compton account and deposited in his Temple City account. This check was charged to his Compton account on March 15, 1943 after clearing. The $246.27 represented the difference between the amount of Federal and State income tax due on the first installment of 1942 tax attributable to including the $4,000 received from petitioners, and the amount due as computed by Gearheart ($34.92) without including the $4,000. A check in the amount of $212.28 was drawn by Gearheart on his Compton account, charged to the account on June 10, 1943, and deposited in his Temple City account. The $212.28 represented the difference between the amount of Federal income tax due on the second installment of 1942 attributable to including the $4,000 received from petitioners, and the amount *21 due as computed by Gearheart ($34.92) without including the $4,000. A check in the amount of $675.56 was drawn by Gearheart on his Compton account, charged to the account on September 15, 1943, and deposited in his Temple City account. The $675.56 represented the difference between the amount of income tax due for first payment on estimated tax for 1943 as computed by Gearheart ($749.75) attributable to including the $12,000 received from petitioners in 1943, and the amount of estimated tax as computed by Gearheart ($74.19) without including the $12,000. Gearheart had computed that $749.75 was the amount of the second payment of estimated 1943 tax due in December of 1943, $675.56 of which was attributable to including the $12,000 received from petitioners, and $74.18 of which was attributable to his individual income without including the $12,000. The second installment of 1943 estimated tax in the amount of $749.75 was paid. Gearheart and his wife filed separate returns for 1943 on March 15, 1944. These returns showed that Gearheart and his wife had each overpaid 1943 tax by $132.29 which they elected to have credited to 1944 estimated tax. In January 1944, Gearheart transferred *22 $317.55 by check from his Compton bank account to his Temple City account, and in March 1944, drew and cashed a $100 check on his Compton account, which was charged to such account on March 27, 1944. The latter two amounts, plus the $264.50 refund credited to 1944 estimated tax, total $682.05. In computing the amount of tax to be paid on his 1942 and estimated 1943 individual income without including the $16,000 received from petitioners, Gearheart had used the figure $218.21. In a later computation he determined that only $139.66 was due in 1942 and no tax in 1943 on such individual income. Thus, in his original computation he had allocated $78.55 too much to his individual income. This error was noted on an adding machine tape attached to the 1943 return first handed to the investigating agent. In 1943, Donald DeSilva was a partner with petitioner in the Arroyo Seco Oil Company. Petitioner told DeSilva that he wanted to borrow some money from Gearheart; that he wanted the money to come through DeSilva and not through Gearheart; that Gearheart would give DeSilva a check and that he was to give Gearheart a note back for the check; and that DeSilva was then to give petitioner a *23 check and petitioner would give him a note. DeSilva knew Gearheart "slightly" at that time. In October 1943 Gearheart drew a check in the amount of $4,500 on his Compton account payable to Donald DeSilva. This check was deposited in DeSilva's account on October 5, 1943, and charged to Gearheart's Compton account after clearing on October 6, 1943. On October 4, 1943, DeSilva drew a check in the amount of $4,500 payable to the M. C. Nottingham Co. This check was deposited in one of the proprietorship bank accounts in Temple City on October 5, 1943, and was charged to DeSilva's bank account after clearing on October 8, 1943. On petitioners' deposit ticket was noted "Loan from Don Desilva 6% int." Gearheart drew and cashed a check for $1,000 which was charged against his Compton bank account on June 28, 1943. He also drew and cashed a check for $2,000 which was charged against his Compton bank account on August 18, 1943. On October 28, 1943, petitioner made a cash investment of $1,000 in the Arroyo Seco Oil Co. On December 13, 1943, petitioner made a cash investment of $2,000 in the Arroyo Seco Oil Co. On May 22, 1944, Gearheart closed out his Compton checking account taking the *24 balance of $2,076.09 in the form of a cashier's check. This cashier's check was turned over to petitioners, endorsed by Bertha Nottingham, and deposited in petitioners' personal bank account. The respondent disallowed the deductions claimed by petitioners for payments to Gearheart in 1942 and 1943. Labor and Wages In determining the deficiencies for 1942, the respondent disallowed a deduction of $8,871.14 claimed by petitioners for labor and wages. Of this amount $2,695.22 represented an amount paid as compensation to petitioner and $5,475.92 represented the portion of a deduction of $12,611.44, claimed to be due to four employees at the end of 1942 under a profit-sharing agreement, which was not paid. In 1942 petitioners deducted as labor expense of the proprietorship an amount of $2,695.22 which represented payroll checks paid to petitioner and charged to payroll account. These checks were deposited in petitioners' personal bank account. This amount was not included in petitioners' income, but was restored to income by the amended returns. At the end of 1941 petitioner entered into a profit-sharing agreement with three of the employees of the proprietorship. A fourth employee *25 was included in the agreement in August 1942. The agreement provided that each employee would receive a specified salary, and as additional compensation an amount equal to fifteen per cent of the net profits of the business to be paid semiannually in June and December of each year. The agreement did not contain all the details of computing the profits to be shared. At the time the agreement was executed the petitioner had an oral understanding with the employees that in computing the amount of the profits deductions would be made for a salary for himself equal in amount to the combined salaries of the employees for rent of his equipment and for business expenses. In the middle of 1942, petitioner employed J. R. Brunning an accountant. At the end of that year he discussed with this accountant the method of computing the profits to be shared for the last six months of 1942. The accountant made a computation which showed that each employee was entitled to receive approximately $3,000. The petitioner argued that the computation was not right because the accountant had made no deduction, in arriving at the amount of profits to be shared, for salary for petitioner and rent for his equipment. *26 The accountant told petitioner that salary for him and rent for his equipment were not proper deductions because the business was operated as a sole proprietorship. The accountant convinced petitioner that his computation was correct and that the employees were entitled to receive the amount of $12,611.44 as their share of profits under the profitsharing agreement. This amount was charged to the proprietorship payroll account in 1942 and deducted as an expense forl abor and wages in the 1942 returns of the petitioners. Near the end of 1942 the four employees were called together and received profitsharing checks from the petitioner, three of which checks were in the amount of $2,000 each and the fourth in the amount of $1,986.62. [2] The checks were dated December 31, 1942. Pursuant to petitioner's request, the employees endorsed the checks, returned them to petitioner in exchange for four notes payable December 31, 1943, in the face amount of $2,000 each. The petitioner, without adding his endorsement to the checks, used them to purchase four cashier's checks in the face amount of $2,000 each on December 31, 1942. Petitioner then deposited the four cashier's checks in one of the *27 proprietorship bank accounts on December 31, 1942. In March 1943 each of the four employees received an additional profit-sharing check in the amount of $1,152.86. These checks were issued on or about March 15, 1943, but were dated December 31, 1942. The employees retained the proceeds of these checks. In 1943, another accountant, Wm. P. Bamber, was employed by the petitioner to make certain corrections in the books and prepare the 1942 returns of petitioners. Petioner discussed with him the computation made by Brunning of the shares of profits due the four employees at the end of 1942 under the profit-sharing agreement. Bamber advised the petitioner that a salary for himself and rent for the equipment of the proprietorship could be deducted for the purpose of determining the shares of 1942 profits which the employees were entitled to receive, but that these deductions could not be taken for income tax purposes. Bamber recomputed the shares of the profits which the employees were entitled to receive as of December 31, 1942. Bamber's computation disclosed that three of the employees were *28 entitled to additional payments of $841.36 and the fourth employee to nothing. The employees were informed of this in the latter part of 1943 and orally agreed to return the four notes. In February 1944 a written agreement was signed by petitioner and the four employees formalizing the oral agreement of the four employees to return to petitioner the four notes issued them on December 31, 1942. Three of the employees received $841.36 in exchange for their notes, the fourth employee received nothing in exchange for his note. No income was reported by petitioner due to the cancellation of the notes since upon cancellation the notes payable account on petitioners' books was debited but the credit was to capital account rather than to income. Partnership Deductions During 1942 and 1943 petitioner and Paul Vukich were partners in the M. C. Nottingham Construction Company. During 1942 and 1943 Nick Mlagenovich was employed by the partnership under a profit-sharing agreement. During 1942 Curry Bachman entered into a contract with petitioner to act as a sales representative of the partnership in San Diego and was to receive 10 per cent of gross receipts on jobs secured for the partnership *29 in San Diego other than U.S. Government work. In 1942 a dispute arose between Bachman and the partners as to the amount of commissions due Bachman under the contract. Bachman turned over partnership receipts totaling $3,739 in 1942 to his attorney to be held in trust pending the outcome of the dispute. Bachman advised petitioner that he was withholding these funds. These partnership receipts totaling $3,739 withheld by Bachman were not entered in the partnership books nor reported as income by the partnership. In 1945, Bachman commenced suit against petitioner and Paul Vukich. On the answer filed by petitioner to Bachman's complaint, petitioner denied that Bachman was entitled to the $3,739.81 withheld receipts and alleged that their retention by Bachman amounted to a conversion. The answer further alleged that such funds had been withheld at all times against the partners' will and without their consent, and that Bachman had been paid all amounts due him under the contract with the exception of $375.98 which was admitted to be due to him. In the answer petitioner prayed for judgment against Bachman for the sum of $3,363.83, representing the $3,739.81 funds withheld by Bachman *30 less the $375.98 admitted to be due him by petitioner under the contract. In 1947, Bachman's suit against petitioner and Vukich was settled and the suit dismissed. Under the terms of the settlement Bachman retained the $3,739 and was paid an additional $900 by the partners. Mlagenovich was paid certain amounts by the partnership during the course of his employment and also retained salaries paid to him by general contractors for supervising jobs. In 1943 a dispute arose between Mlagenovich and the partners as to the amount of Mlagenovich's share of the profits for the year 1942. In May 1943 an entry was made on the partnership books debiting salaries in the amount of $2,558.69 and crediting accounts payable to Mlagenovich as of December 31, 1942. At or about the same date a corresponding entry was made debiting petitioner's personal account and Vukich's personal account for $1,279.35 each and crediting M. C. Nottingham Co., the proprietorship, for $2,558.69. This latter entry was made to record a check dated May 7, 1943, payable to Nick M. Mlagenovich in the amount of $2,380.88 ($2,558.69 net of withholding taxes), which check was never signed by the maker. The original 1942 *31 partnership return, filed presumably after the above entries of May 1943 were made, included the amount of $2,558.69 in the deduction claimed for labor. The partnership returns were filed on a calendar year basis. In June 1943 a reversing entry was made debiting accounts payable to Mlagenovich in the amount of $2,558.69 and crediting petitioner's personal account and Vukich's personal account in the amount of $1,279.35 each. An amended 1942 partnership return was filed restoring the amount of $2,558.69 to income accompanied by the explanation, "An amount of $2,558.69 was shown on the return as a deduction from income, representing expenses for labor paid as additional compensation to superintendent. This amount was entered on the books as an accrual item. No payment has ever been made, and information now indicates it will not be paid. This amount has therefore been restored to income." The copy of the amended 1942 return introduced in evidence contains a notation in writing that it was filed on May 22, 1944. On June 7, 1944 Mlagenovich brought suit against petitioner and Vukich over his share of the profits under the profit sharing agreement. In his answer to Mlagenovich's complaint *32 filed July 3, 1944, the petitioner alleged that Mlagenovich earned, from the beginning of his employment on or about March 1, 1942, until termination on or about March 1, 1944, the sum of $10,448.20; that there was paid upon the earnings and received by Mlagenovich the sum of $4,977.13 in 1942, the sum of $4,440.42 in 1943 and $500 in February 1944, a total payment of $9,917.55; and that the true amount owing Mlagenovich when he left his employment was then unknown or unascertained but that subsequent computations and audits disclosed that $530.65 was owing and unpaid at the time the answer was filed. Petitioner also alleged in his answer that the check for $2,558.69 made out on May 7, 1943, was not delivered to Mlagenovich for the reason that it was discovered that this amount was not owing to Mlagenovich. On February 27, 1947, an out of court settlement was made between Mlagenovich and petitioner and Vukich whereby Mlagenovich was paid $8,000 by petitioner and Vukich. Pursuant to such settlement, Mlagenovich dismissed his suit against petitioner and Vukich on June 11, 1947. Petitioner and Vukich always denied that he was a partner. Fraud During the years 1942 and 1943 cash *33 sales in the respective amounts of $3,459 and $3,289.20 were omitted from the proprietorship books and records and from the original 1942 returns and 1943 returns filed by petitioners. Petitioners maintained card index files and on regular sales the cards were numbered and the sales recorded in the proprietorship books. On cash sales, however, the bookkeeper in charge of recording sales was instructed to place an "X" on the cards in lieu of numbering them and not to record such sales. The cash from such sales was turned over to Bertha Nottingham and the "X" cards were kept in a desk drawer and were not filed in the index files with the cards covering the non-cash sales. A record of many of the omitted sales was maintained by Bertha Nottingham in a small black book not a part of the accounting records of the proprietorship. In February 1943, Frank Phillips, who had been employed as office accountant for petitioners in January 1943, discovered that certain sales were not being entered on the proprietorship books. He advised petitioner of these omitted sales prior to the filing of petitioners' original 1942 returns. The practice of not recording cash sales continued even after Phillips *34 told petitioner about the omitted sales. In March 1943, petitioners hired an outside accountant, W. P. Bamber, to prepare their 1942 income tax returns and to make a survey of the books and records. At the time Bamber prepared and filed petitioners' original 1942 returns, which were filed May 13, 1943, he had no knowledge that sales were omitted from the proprietorship books and records. After the original 1942 returns were prepared and filed Bamber was advised by Phillips of the omitted sales. Bamber requested petitioners to turn over all records of omitted sales. Before the small black book was turned over to Bamber certain pages, on which omitted sales were recorded, were removed from the book and hidden. In July 1943 Phillips entered approximately $3,700 in omitted 1942 sales on the books. In addition to this amount there were $3,289.20 in omitted sales for 1943. The amended 1942 returns filed for petitioners in May 1944 reported omitted sales of $2,901.67; there were omitted sales in 1942 totaling $3,459. In preparing petitioners' returns, Bamber did not make a complete audit of their books and records. Petitioner admitted to the investigating revenue agent that he and *35 his wife had started out withholding sales in small amounts and that the thing had kept growing and growing until it got out of their control. In November of 1943, petitioner gave $4,000 in cash to Donald DeSilva, which amount was deposited in DeSilva's bank account on November 6, 1943. In exchange for the cash, DeSilva gave petitioner a check for $4,000 dated November 8, 1943. DeSilva's check was deposited in the proprietorship account on November 8, 1943, and on the deposit slip was noted "Loan from Don DeSilva 6%". The $4,000 in cash did not come from the bank accounts of the petitioners, nor was it reflected on the petitioners' books and records as a disbursement. Personal expenses were charged as business expenses on petitioners' books and records and were deducted on the returns. Brunning, an outside accountant employed by petitioner in 1942, advised petitioner prior to the time the original 1942 returns were filed that personal expenses were reflected in the business books and records. These personal expenses were charged on the books as business expenses pursuant to instructions from petitioners. One of petitioner's bookkeepers advised him, prior to the filing of the *36 original 1942 returns, that personal items were being charged to business expense and that such expenses were not deductible but should be charged to personal drawing account. Petitioner's distributable share of income as a partner in the Arroyo Seco Oil Co. during 1943 was $980.44. This partnership income was not reported by petitioners in their 1943 returns. A check for $290 received by petitioners from the Arroyo Seco Oil Co. on December 31, 1943, was deposited in petitioners' personal bank account on December 31, 1943, and no entry was made in their books and records. Despite a request from the examining agent at the start of the investigation to turn over all bank records, business and personal, savings and commercial, petitioner did not turn over all his bank records. The agent continued to discover additional bank accounts, despite petitioner's continued denials that there were any more such accounts. In 1942 and 1943, petitioners followed a pattern established in earlier years of deliberately omitting cash sales from their records and returns. In their returns for 1942 and 1943 petitioners deliberately claimed excessive deductions and despite repeated warnings deducted *37 personal items in the guise of business expense. Petitioners entered into a conspiracy with E. Fred Gearheart to reduce their income taxes by claiming fictitious salary payments to him. Petitioners attempted to evade their 1942 income taxes by means of a sham sale and repurchase transaction between the proprietorship and their wholly owned corporation, the Hygiene Products Co. Mark C. Nottingham and Bertha V. Nottingham separately filed false and fraudulent returns for the years 1942 and 1943, and part of the deficiencies for each of these years was due to fraud with intent to evade tax. Opinion RAUM, Judge: 1. The first issue relates to the respondent's determination that petitioners overstated the cost of goods sold in 1942 by the amount of $6,334. In 1942 petitioners entered into a cost plus contract with the United States under which the proprietorship was to sell and install septic tanks at Pinedale, California. The tanks were manufactured by the proprietorship in Temple City at a cost of $5,786 and were shipped to Pinedale directly from Temple City. Petitioners went through the motions of making a sale of the tanks to their wholly-owned dormant corporation, the Hygiene *38 Products Company, for $5,786 and a repurchase from that corporation for $12,120. The corporation had not engaged in any business activity since 1939 and had no employees, no office, no books, records or bank account. Petitioners urge that the alleged sale and purchase was made at the suggestion of the Army contracting officer to simplify accounting procedures with the Government under the cost plus contract. We are not convinced that this was the purpose of the steps taken, and even if it be assumed that it was, there was no bona fide purchase and sale by the Hygiene Products Company. That corporation was dormant and a mere shell. There is no convincing evidence that it had funds to make a purchase or that it ever received the proceeds of any sale. The purchase and sale transactions were mere shams and were made for the obvious purpose of increasing the cost of goods sold by petitioners. The respondent did not err in disregarding them and in including the overstated cost of goods sold, amounting to $6,334, in the income of petitioners for the year 1942. Cf. . 2. In determining the deficiencies for the years 1942 and 1943 the respondent *39 disallowed numerous deductions taken by petitioners on the ground that they represented nondeductible personal expenses or were unsubstantiated. At the trial petitioners stipulated that many of the claimed deductions were properly disallowed by the respondent, and also conceded the correctness of the respondent's determinations with respect to others upon which no evidence was introduced. Evidence was introduced by petitioners with respect to a few remaining expenditures, particularly, (1) for a cocktail bar and other furniture for a rumpus room, (2) for a bicycle, and (3) for one case of whiskey. The evidence with respect to the expenditure of $329.60 for the cocktail bar and other furniture for the rumpus room convinces us that this expenditure was made for the purpose of entertaining customers and employees. The expenditure is not, however, deductible as a business expense for 1942. It was made to purchase business assets the life of which extended beyond the taxable year. It was, therefore, a capital expenditure, the amount of which is recoverable through depreciation over the life of the assets. Although the evidence with respect to the bicycle is fragmentary, we are satisfied *40 that the expenditure was made to replace a bicycle destroyed by one of petitioner's trucks, and we hold that it is deductible. The evidence with respect to the expenditure for the whiskey does not convince us that it was an ordinary and necessary expense of petitioners' business, and respondent's disallowance is approved. Nor are we satisfied by the evidence that any of the other remaining controverted expenditures, small in number and amount, were deductible business expenses. 3. This issue relates to the disallowance by the respondent of salary deductions claimed by the petitioners for payments of $4,000 in 1942 and $12,000 in 1943 to E. F. Gearheart. The petitioners contend that Gearheart rendered valuable services to the partnership and that the deductions claimed were proper. The evidence relating to this issue discloses to our satisfaction that the payments of $1,000 a month to Gearheart were not bona fide payments for any services rendered by him; that it was never intended that Gearheart should retain any substantial amount of these payments as his own funds; that there was an understanding between the petitioners and Gearheart, that Gearheart, after deducting amounts sufficient *41 to pay income taxes on the payments received by him in 1942 and 1943, would return the remainder to the petitioners; and that a substantial portion of the payments was funneled back to the petitioners by the use of elaborate artifices. The evidence is in large part circumstantial, but it is strong and convincing. In the circumstances, we hold that the respondent did not err in disallowing the deductions of $4,000 for 1942 and $12,000 for 1943, claimed by petitioners in their returns as "Salary" paid to Gearheart. 4. In determining the deficiencies for 1942, the respondent disallowed deductions totaling $8,171.14 claimed by petitioners as expense for labor and wages. Of the amount disallowed $2,695.22 represented payroll checks paid to the petitioner. This amount was not included as income in petitioners' original 1942 returns. A sole proprietor cannot deduct amounts paid to himself as compensation unless he restores that amount to income by reporting the compensation. The claimed deduction was eliminated on the amended 1942 returns filed by petitioners. The remainder of the disallowed deductions of $8,171.14, amounting to $5,475.92, represents the portion of a deduction of $12,611.44 *42 which was accrued as due to four employees at the end of 1942 under a profitsharing agreement, but which was not paid to the employees during 1942. The respondent contends that the petitioners never intended to pay the employees under the profit-sharing agreement any more than the employees actually received and retained, and that, inasmuch as they actually received and retained only $7,135.52, the deduction of $12,611.44 taken in 1942 was excessive in the amount of $5,475.92, and that amount should be disallowed as a deduction for 1942. In the alternative, the respondent contends that if this Court should hold that the claimed deduction of $12,611.44 is allowable for 1942, the $5,475.92 is taxable income of petitioners for 1943, because in that year the employees orally agreed to a cancellation of indebtedness of that amount and the petitioners knew that it would never be paid. At the end of 1942 all of the events had occurred which fixed the amount and the fact of the liability of the proprietorship to its four employees under the profit-sharing agreement. A computation was made by an accountant which disclosed that the amount of that liability was $12,611.44. Although petitioner *43 urged that the computation was wrong in that it did not take into consideration a salary for himself and rent for equipment, the accountant convinced him that it was correct and the $12,611.44 was accrued as a liability on the books of the proprietorship and a deduction of this amount for labor and wages was taken in petitioners' returns for 1942. The evidence convinces us that petitioners, whose books were kept on an accrual basis, properly accrued and deducted the amount of $12,611.44 on their 1942 returns. Cf. . In 1943, petitioner discussed the computation made by the accountant in 1942 with another accountant, and the latter advised him that the computation made by the first accountant was erroneous in that a salary for petitioner and rent for equipment of the proprietorship was deductible in computing the 1942 shares of profits to which four employees were entitled under the profitsharing agreement, even though these items were not deductible for income tax purposes. A computation made by the second accountant in 1943 disclosed that the liability of petitioners under the agreement was $5,475.92 less than that determined *44 by the first accountant, and the employees in 1943 agreed to return for cancellation the note for $2,000 which each of them received on December 31, 1942, and accept the amount of $2,524.08. Since it was ascertained in 1943 that $5,475.92 of the amount deducted from income in 1942 would never be paid, that amount was includible in the income of petitioners for 1943. Cf. ; , appeal dismissed, (C.A. 9). 5. Petitioners contend that they are entitled to reduce their community income from the M. C. Nottingham Construction Company partnership by certain deductions which they claim were accruable in 1942 and 1943. During 1942 Curry Bachman had a contract with the partnership which provided that he was to receive as its sales representative 10 per cent of the gross receipts on jobs he secured for it. He withheld as his commissions $3,739 of the receipts on jobs which he secured in 1942 pending the outcome of a dispute as to the amount of those commissions. The amount of the withheld receipts was not included in income in the partnership *45 returns for 1942, and in those returns no deduction was claimed for any commissions payable to Bachman. In amended petitions the petitioners allege that the respondent erred in failing to reduce the community shares of the income of the partnership which they reported for 1942 by the amount of the receipts withheld by Bachman. They ignore the fact that the partnership failed to accrue and report the amount of the withheld receipts as income in its returns for 1942. The respondent in determining the deficiencies did not add the amount of the withheld receipts to the income reported by the partnership for 1942. Even if it be assumed that this amount represented commissions payable to Bachman under his contract with the partnership, the net income reported by the partnership cannot be reduced by that amount when the partners failed to report as income an equivalent amount of accruable gross receipts. Having reached this conclusion we do not deem it necessary to discuss or decide whether, if the partnership had properly accrued and reported the amount of the withheld receipts as income for 1942, the dispute between the partners and Bachman with respect to the amount of his commissions *46 would preclude the accrual and deduction by the partnership of $3,739 as commissions payable to him for 1942. Petitioners also urge that the partnership is entitled to accrue as deductions in 1942 and 1943 the respective amounts of $2,558.69 and $9,882.62 by reason of compensation admitted to be due to Nich Mlagenovich. The facts relating to the item of $2,558.69 show that in May 1943 entries were made in the partnership books setting up a liability of the partnership to Mlagenovich in the amount of $2,558.69, and that a check was made out to Mlagenovich, but was not signed and delivered to him. In subsequent court proceedings brought by Mlagenovich petitioner alleged that this check was not delivered for the reason that it was discovered that this amount was not due to Mlagenovich. In the original partnership return for 1942 filed in 1943, a deduction of $2,558.69 was claimed for labor. In June 1943 the entry setting up a liability to Mlagenovich in the amount of $2,558.69 on the books of the partnership was reversed. In an amended 1942 partnership return filed in 1944, the $2,558.69 was restored to income with the explanation that this "amount was entered on the books as an accrual *47 item. No payment has ever been made, and information now indicates it will not be paid." In order to be entitled to the claimed deduction of $2,558.69, it was incumbent upon the petitioners to establish that the partnership, which kept its books on an accrual basis, had a definite liability as of December 31, 1942, to pay Mlagenovich the amount of $2,558.69 as his share of profits for 1942 under the profit-sharing agreement. It is not entitled to a deduction for an expense the amount of which is unsettled and the liability for which is uncertain. Cf. ; . The inconsistent treatment accorded this item on the partnership books and in its original and amended returns for 1942 clearly indicates that the amount of any liability to Mlagenovich, as of December 31, 1942, for a share of its 1942 profits was unsettled and uncertain. In the circumstances the respondent did not err in failing to allow the deduction of $2,558.69 in computing the net income of *48 the partnership for 1942 and the petitioners' community shares of that net income. Both parties agree that the right of the partnership to deduct in computing its net income for the year 1943 the amount of $9,882.62, as Mlagenovich's share of its profits for that year, is in controversy. However, no evidence was introduced by petitioners establishing that the partnership had any fixed liability to pay this amount to Mlagenovich as of December 31, 1943, and the claimed deduction cannot be allowed. 6. There remains the question of whether the returns filed by petitioners for the years 1942 and 1943 were false and fraudulent. We have found that they were, and that part of the deficiencies for each of these years was due to fraud with intent to evade tax. We do not deem it necessary to discuss in detail the evidence which we believe requires this conclusion. Suffice to say that it convinces us that cash sales were omitted from books and records and not reported in petitioners' returns; that personal expenses were entered in the books of the proprietorship and deducted in petitioners' returns in the guise of business expenses; and that other artifices, such as fictitious salary payments *49 to Gearheart, were utilized to reduce and evade income taxes. The evidence also convinces us that these things were done with the knowledge of both petitioners and that they deliberately disregarded advice given to them by accountants, revenue agents, and others, in carrying out some of these fraudulent practices. Decisions will be entered under Rule 50. Footnotes
1. The first copy of the 1943 return lists income tax liability for 1942 at $139.66. The correct computation at 1942 rates without the $4,000 payments and without the State Employment Tax deduction of $30 attributable to such payments is $133.79.↩
2. This check was less than $2,000 because of a withholding of $23.38 for income tax.↩